# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Marie Crawley,

      Plaintiff,

                                         Case No. C-2-02-1069

-V-                                      JUDGE SMITH

                                           Magistrate Judge Kemp

State of Ohio, Department of Transportation,

      Defendant.

## OPINION AND ORDER

    Plaintiff, Marie Crawley, asserts claims of discrimination, hostile work environment, and retaliation under the Civil Rights Act of 1964**.**  This matter is before the Court on Defendant State of Ohio, Department of Transportation's Motion for Summary Judgment (Doc 21).  Based on the following, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.  FACTS

    Plaintiff, Marie Crawley, is an African-American female who currently resides in Steubenville, Ohio.  The Ohio Department of Transportation ("ODOT") is the sole defendant. ODOT is an agency of the State of Ohio established by, and whose duties are described by*, inter alia*, O.R.C. Chapter 5501.

    Plaintiff was hired by Defendant State of Ohio, Department of Transportation ("ODOT") on April 1, 1985, as a Highway Maintenance Worker 1 ("HW1").  HW1's were basically laborers for ODOT, but they occasionally functioned as relief drivers for heavy equipment, such as snow plows

and dump trucks.  The operation of heavy equipment is a higher-ranked, more important duty of Highway Maintenance Worker 2 ("HW2") although that classification also can function as laborers. Ms. Crawley, during fair weather, would provide traffic control as a flagger for road projects.  If no construction was happening, Ms. Crawley would patrol the roads in a pick-up truck removing litter, picking up parts, or performing other menial tasks.  During the "snow and ice" season, at the time when the Jefferson County Garage maintained around-the-clock two-way radio coverage, Ms. Crawley operated the radio from 11:00 p.m. to 7:00 a.m.  Unless snow removal crews were actually on the road, this job involved very minimal responsibilities and the operator would sit around, watch television, empty the trash and tidy up.

Throughout her 17-year career, Ms. Crawley was assigned to the Wintersville Garage in Jefferson County, Ohio as a HW1.  Jefferson County is in ODOT District 11, which consists of Tuscarawas, Jefferson, Columbiana, Belmont, Harrison, Carroll and Holmes Counties.  District 11 is headquartered in New Philadelphia, Ohio.

There were about 30 ODOT employees in Jefferson County at any one time.  During the time Ms. Crawley worked at the Wintersville Garage, other African-American employees included Greg McGowan, Rod Collins, Ernie Fleshman and Robert Safford.  McGowan and Collins were HW2's, Fleshman was a Project Inspector who worked in the Wintersville Garage during snow and ice season, and Safford was a custodial worker at the Wintersville Garage.  In 1996, McGowan became Chief Steward and President of the Jefferson County Chapter of the Ohio Civil Services Employees Association, Local 11, AFSCME, AFL-CIO.  Collins left in 1996, Fleshman started reporting to the Wintersville Garage in 1999, and Safford retired in 2000 at the age of 70.

In 1985, when Ms. Crawley began with ODOT, the Jefferson County Superintendent was

Tony Silvini and the Assistant Superintendent was Lou Phillippi.  For a brief period in 1993, Silvini was replaced by Ron Bovetsky on an acting basis.  Silvini was permanently replaced by Billy Hupp. Rick Newbold became Superintendent in 1994.  In 1997, ODOT reorganized and County Superintendents were replaced by County Managers, whose duties became enlarged.  Don Bennett became County Manager in 1997.  His assistants were Rick Newbold and Terry Hartman.  In 2000, Bennett retired.  Hartman transferred to a position in the District 11 office, and Newbold became Jefferson County Manager.  His assistant became Harry Scott.  In 2001, Newbold got two new assistants, John Petrisko and Lois Wright.

Ed Flynn has been ODOT's Assistant Administrator for Labor Relations since 1994, a position housed in ODOT's Central Office in Columbus that reports to Labor Relations Administrator Jim Miller.  Mr. Flynn is responsible for attending pre-arbitration labor grievance mediations on behalf of ODOT.  Since 1985, Pete Applegarth has been District 11's Labor Relations Officer, reporting to the District 11 Deputy Director.  Mr. Applegarth provides advice to District 11 managers on labor contract administration and handles all discipline administered to bargaining unit members in the district.

In 1985, when Ms. Crawley began her employment with ODOT, she claims she was denied heavy equipment training.  Ms. Crawley stated that George Eny offered and began to informally teach her to drive the dump truck.  Ms. Crawley actually used his training to pick up loads of grit and dump it.  Ms. Crawley testified that Mr. Eny told her that one employee, a crew leader, called Mr. Eny a "nigger lover" for training Ms. Crawley.  Soon after, Tony Silvini, Ms. Crawley's supervisor, brought her into his office and told her that the guys did not want her driving a truck. (Crawley Depo. at 75).  Mr. Silvini said since the guys don't want you out there driving a truck, it

would be best for you to not even go in there to do that. *Id*.  Ms. Crawley testified that Silvini was not a racist and was nice to her. *Id.* 81-82.  Ms. Crawley also testified that she did not think that the denial of training was racially motivated.  Rather, she felt the guys did not want her to learn to drive heavy equipment because "[f]or some reason, they thought I was coming to take someone's job.  They said she's just here to take somebody's job." *Id*.

Ms. Crawley maintains that this denial of training effectively denied her of any opportunity to be promoted to HW2. (Pl's Memo. in Opp. at 5).  Defendant ODOT maintains that the career path from HW1 to HW2 was to apply for a vacant HW2 position, then, if the employee met the minimum qualifications, he or she would be selected on the basis of seniority. (Def.'s Mot for Summ. J. at 5-6).  Proficiency in the operation of heavy equipment was not treated as a minimum qualification for HW2, and a HW2 could receive heavy equipment training after being promoted. *Id*.  ODOT maintains that Ms. Crawley never applied for HW2. *Id. citing* McGowen Depo.. at 15-16.

During the late 1980s, Ms. Crawley testified that one crew leader would drive around in the middle of winter with the windows down and smoke one cigarette after another so that she would freeze.  (Crawley Depo. at 83).  Crawley testified that she sometimes complained to Lou Phillippi, the superintendent, who told her he would talk to this guy.  Crawley said that after she complained, it would sometimes change for a little while, but then it would go back to the same thing.  One day (also in the late 1980's), when Ms. Crawley was serving as a traffic control person, this same guy took her out 10-20 miles from the garage, and 2 miles from the nearest ODOT crew. *Id.* at 84.  At the end of Ms. Crawley's shift, the crew leader did not pick Ms. Crawley up.  Ms. Crawley walked 5 miles until she ran into Lou Phillipi, the superintendent.   Mr. Phillippi saw her and wanted to know what she was doing out there.  When Ms. Crawley explained what had happened to the

superintendent, he was very upset.  Ms. Crawley testified that when the crew leader was confronted by the superintendent about the incident, he just hunched his shoulders and said he thought somebody would pick her up.  Following this incident, Ms. Crawley was taken off of that crew leader and put with someone else.  The total amount of time Ms. Crawley worked with this guy was a couple of months.  When Ms. Crawley was asked whether or not she thought these acts were racially motivated, she testified, "it could not have been, but I believe it was." *Id.* at 197.   Ms. Crawley thinks the crew leader's actions were racially motivated because of some things that were said at the time, but she no longer remembers what was said. *Id.* at 197-98.

In 1988 or 1989, Ms. Crawley testified that John Otto, a Bridge Worker, was in the lunchroom with her and was talking to her about how white her socks were and said "[b]lack people can make socks white, but I – every time when we buy them, that's the last time they're white." (Crawley Depo.. at 90).  He proceeded to show her his dingy socks.  *Id.*  She told him to try Clorox and then the conversation moved on to other things and all of the sudden he says, "you're nothing but a black nigger anyhow." *Id.*  Ms. Crawley testified she went to Tony Silvini, the superintendent at the time, and told him what happened. *Id.*  Mr. Silvini immediately brought Mr. Otto into his office and told him "we were not going to tolerate it, we're not going to have this here." *Id.*  Mr. Silvini had John Otto apologize to Crawley.  *Id.* at 91.  Ms. Crawley further testified that after they got out the door, Mr. Otto rescinded the apology. *Id.*  Ms. Crawley did not report that Mr. Otto rescinded his apology. *Id.*  Ms. Crawley described Mr. Otto as a bridgeworker who mostly worked "in his own orbit," but occasionally worked with Ms. Crawley whenever he didn't have another job to do.  Ms. Crawley testified she got along okay with him before and after the encounter and that she "considered the source" because "he didn't care what he said to people and he was an alcoholic

5

. . . ." *Id.* at 92.  Ms. Crawley testified that Mr. Otto used the term "nigger" in her presence after this incident, but that she tried not to pay attention.  *Id.*  Ms. Crawley explained that she did not report Mr. Otto's continued use of this word in her presence to Mr. Silvini or anyone else in management because Mr. Otto was a problem person and had many problems with many people and she did not feel anything would be done if she reported it. *Id.* at 93.  Ms. Crawley testified Mr. Otto left ODOT in 1999 or 2000. *Id.* at 105.

One day during the summer of 1992, Ms. Crawley met Mike Sciarra, a HW2.  Ms. Crawley testified that Mr. Sciarra was a person that almost no one liked and consequently, ODOT placed him in the Georgesrun outpost where he worked by himself. Crawley Depo. at 94.  Ms. Crawley's crew was doing work in that area, so they went in for lunch and Sciarra was there.  *Id.* at 94.  Dennis Moore, a white man, was with her. *Id.*  Crawley was told Mr. Sciarra works at the Georgesrun outpost by himself because he cannot work with anyone else and nobody wants to work with him. *Id.*  Crawley offered to work with him. *Id.* at 95.  When Ms. Crawley told Mr. Sciarra that she would work with him, he said "no, you won't." *Id.*  When Ms. Crawley asked why, Mr. Sciarra told her "because I'm a bigot." *Id.*  Ms. Crawley says she is really good friends with Dennis Moore and that Dennis Moore got mad at Mr. Sciarra telling Ms. Crawley he was a bigot and wanted to fight Mr. Sciarra. *Id.*  Ms. Crawley convinced Dennis Moore to leave. *Id.*  Ms. Crawley reported this incident to Mr. Silvini. *Id.*  Mr. Silvini called Mr. Sciarra in and talked to him. *Id.* at 97.  After Mr. Silvini's meeting with Mr. Sciarra, Mr. Sciarra never again told Ms. Crawley he was a bigot, nor did he ever make racially derogatory comments to her. *Id.*  Dennis Moore told Ms. Crawley that Mr. Sciarra told him he didn't like black people and was a bigot because his dad was a bigot. *Id.*  Ms. Crawley said that she just did not care and thought he had a problem. *Id.* at 99.

6

One night in the winter of 1993, when Ms. Crawley was working as radio dispatcher, Mr. Sciarra called to report a problem. *Id.* at 100. Ms. Crawley admits that the proper procedure was to recognize the truck number, say it and tell the driver to go ahead with their response. *Id.* Ms. Crawley explained that this way it is clear who she is talking to because she has an open channel with a bunch of people on it. *Id.* Ms. Crawley admits that this particular time she failed to follow the proper procedure and instead just told Mr. Sciarra to go ahead with his message. *Id.* at 101. When Mr. Sciarra called in, Mr. Sciarra told her to either "do her God damn job or go the hell home." *Id.*

Ms. Crawley reported this incidence by filing a grievance. *See Id.*, Ex. 17. Ms. Crawley met with Ron Bovetsky, the temporary superintendent, and the union rep about this grievance. *Id.* at 103. Mr. Bovetsky said there was nothing he could do about it and that it wasn't in violation of FCC rules where this was not considered a curse word. *Id.* Ms. Crawley told the union rep that she wanted an apology or for Mr. Sciarra to get time off. *Id.* at 103. The union rep and Mr. Bovetsky called Mr. Sciarra into their office and talked to him. *Id.* The union rep reported that Mr. Sciarra said he would rather loose his job than apologize. *Id.* at 104. Soon after that, Ms. Crawley spoke with a union investigator and Mr. Bovetsky and suggested that they needed to move him out of this county because she felt other things would happen if he stayed. *Id.* at 105. Consequently, Mr. Sciarra was moved to Cadiz. *Id.* at 105. Ms. Crawley had no other unpleasant dealings with Sciarra. *Id.* at 106.

In 1998 or 1999, Ms. Crawley testified that Terry Sines, crew leader, asked Ms. Crawley what part of Africa she came from. (Crawley Depo. at 113). Ms. Crawley further testified that Mr. Sines told her she looked as if she came from some African tribe. *Id.* Ms. Crawley says she might

7

have reported this, but cannot remember to who or what she said. *Id.* at 116.  Ms. Crawley also alleges that on one occasion in 2000, Mr. Sines wanted her to walk on the highway with all of her equipment instead of driving the pick-up to try out an invention of his. *Id.* at 119.  Ms. Crawley testified the invention was a type of cart with a place for your water and lunch and signs. *Id.*  The cart was designed by Mr. Sines for traffic control people and other highway jobs so that they would not use the pickup trucks to do the jobs. *Id.*   Though Crawley testified that she did not have a problem with the cart if it was a job that did not require a lot of walking (like most of the jobs she had), she refused to use Mr. Sines cart-invention stating that she did not want to walk 4-5 miles in the sun and it was unsafe. *Id.*  Mr. Sines reported her refusal and asked for her to be moved off her crew and she was. *Id.*  A white woman replaced Crawley and she too was asked to and did pull Mr. Sines' cart-invention. *Id.* at 121.  The white woman did not like pulling the cart either and went back to being a truck driver. *Id.* at 122.  After the white woman quit, the other guys in the garage took and hid Mr. Sines cart-invention because they thought it was nasty too. *Id.*  Even though it was a white woman who ultimately tested Mr. Sines' cart-invention, Ms. Crawley testified she thought Mr. Sines wanted her to test the cart out because of her race. *Id.*  Ms. Crawley testified that she bases this opinion on the fact that Mr. Sines would single her out to do stuff on his jobs. *Id.*  Ms. Crawley was unable to think of any examples where Mr. Sines singled her out. *Id.* at 123.

In February of 1999, during the night shift, mechanic Brent Rose hung a noose from the rafters of the mechanic's bay in the Wintersville Garage.  The noose was evidently tied by either Mr. Rose or John Petrisko.  Allen Whanger was a non-participating observer. When supervision arrived, he made Mr. Rose take it down. (Crawley Depo. at 135-136).

One of Ms. Crawley's co-workers came in and told her about the noose after it was taken

8

down.  *Id.* at 128.   Ms. Crawley provided a statement about it to management. *Id.* at 130.  A co-worker named Allen Whanger told Ms. Crawley it was done on the anniversary of the signing of the emancipation proclamation.[1] *Id.* at 133.   Whanger also told her it was done as a joke. *Id.* at 134. Other co-workers of Ms. Crawley, including Pam Vanezalous, Evelyn Parise and Mark Sprouse, a mechanic, filed a complaint. *Id*. at 134.  They all gave her copies of their reports. *Id.* at 135.  Ms. Crawley says all management did about it was to say it was done as a joke and that they didn't think the perpetrators meant anything by it. *Id.* at 135.

Ms. Crawley testified she felt threatened and that the noose hanging was a racial slur because of the fact of it being done on the anniversary of the Emancipation Proclamation. *Id.* at 136 and 142. Ms. Crawley also thought it was racially motivated because Brent Rose "had always made it clear he did not like black people." *Id.* at 137.  Ms. Crawley could not recall anything specific that Mr. Rose had ever said that was racist. *Id.*  Ms. Crawley says that Mr. Stafford told her that Brent Rose told Mr. Stafford that the noose was meant for him. *Id.* at 139.

Between February 18th and 25th, Mr. Bennett collected statements from Crawley, Petrisko, Rose, Safford, Sutherin and Whanger.  Rose, Petrisko, Sutherin and Whanger denied that the noose was intended to convey racial hatred or threats of violence and instead claimed it was an "anti-management" joke.  Mr. Whanger said the Emancipation Proclamation had come up because Ms. Parise had commented that February 18 was the "day of freedom for the slaves."  Mr. Bennett and Mr. Hartman testified that Mr. Safford, when interviewed by them, appeared nervous, but specifically denied that he felt the noose was directed towards him or African-Americans, that he felt threatened, or that he had been the object of racial remarks. (Hartman Depo. at 29-33; Bennet

---

[1]There is no historical connection between the date the noose was hung and the anniversary of the emancipation proclamation.

Depo. Ex. 2). On or about February 26, 1999, statements materialized from Mses. Vanezalos, Parise and mechanic Mark Sprouse. Mses. Vanezalos and Sprouse opined that Mr. Safford seemed upset about the noose, even though he wouldn't admit it, and reported that the noose may have been directed towards the "round table," a group of employees who ate lunch together. Mr. Parise claimed the noose upset her, and alleged that Mr. Rose had piled the contents of Mr. Safford's desk atop it, turned down the heat in the lunch room where Mr. Safford's desk was situated and replaced Mr. Safford's more comfortable chair with a hard oak one. These statements were given to or solicited by Mr. McGowan. (McGowan Depo. at 95-96). These statements, however, were not provided to Mr. Applegarth, Mr. Bennett or Mr. Newbold, nor did their authors tell the managers anything of the kind. (Applegarth Depo. at 29-30; Bennett Depo. at 95-97; Newbold Depo. at 44-45).

Mr. Applegarth came to Jefferson County from District 11 headquarters and interviewed Mr. Rose and Mr. Whanger on March 4, 1999. These statements added no new information, except that Mr. Whanger indicated that Ms. Vanezalos, Ms. Parise and Mr. Sprouse thought that the noose was directed towards them as members of the so-called "round table." (Applegarth Depo. at 37-40, 86-89, 91-94; Applegarth Depo.. Exs. 6 and 7).

Mr. Bennett concluded that the noose had not been intended to convey a message of racial hatred. (Bennett Depo. at 89-90). Mr. McGowan claims that Mr. Rose, Mr. Petrisko and Mr. Whanger were "relieved" that they would not be disciplined for the noose–that they "didn't have to worry about anything." (McGowan Depo. at 102-103, 142-143).

Mr. Rose was not suspended, but instead was reprimanded at least twice, and admitted that the incident was a "stupid mistake" and "wrong." (Applegarth Depo. at 32-33; Hartman Depo. at

20-22, 25, 27-28).  In addition, at a meeting attended by virtually all employees of the Wintersville

Garage, Mr. Bennett announced that such incidents would not be tolerated in the future.  (Bennett

Depo.. at 106-07).  After the noose incident, Mr. Rose exhibited no more additional behavior in

Jefferson County, except for the allegation that he did not properly maintain the truck used by Ms.

Crawley.  (McGowan Depo. at 104-06).

In 1999 or 2000, Mr. Rose was assigned to maintain the pick-up truck that Ms. Crawley

operated to perform her work duties.  (Crawley Depo. at 157).  During this time, Ms. Crawley

alleges that there were incidents of defective workmanship including twice the radio fuse was

missing and the radio would not play and she also experienced problems with the clutch, fuel gauge

and brakes. *Id.* at 159.  Ms. Crawley asked for a different mechanic, but Mr. Newbold and Mr.

Bennett told her that Rose was going to stay her mechanic.  *Id.* at 162-63.  None of the involved

managers recall Ms. Crawley's having expressed any dissatisfaction with Mr. Rose's work as a

mechanic.  (Bennett Depo. at 111-13; Newbold Depo. at 55-56; Hartman Depo. at 36-37).  Although

each mechanic was assigned heavy equipment to maintain, there was no such assignment for light

trucks – a lower maintenance priority because they were interchangeable and easily replaced.  Mr.

Bennett testified that Ms. Crawley was assigned no particular pick-up truck and drove several of

them.  (Bennett Depo. at 111-12).    Mr. McGowan does not know whether there was any

"assignment" of pick-up trucks to drivers, but believes that Ms. Crawley used one truck in particular

for flagging duties because the equipment was stored in it, and he observed Ms. Crawley cleaning

and fueling the vehicle.  (McGowan Depo. at 104-106).  In 2000, Mr. Rose left the Wintersville

Garage, and soon afterward, Ms. Crawley was given a newer pick-up truck to drive.  (Crawley Depo.

at 164-65).

When Mr. Rose was transferred to a HW2 position in Columbiana County, he was given a promotion which he was entitled to under the collective bargaining agreement because of his seniority. (Crawley Depo. at 139-140; Applegarth Depo. at 47-48; Newbold Depo. at 36; Hartman Depo. at 36; McGowan Depo. at 147-48, 173). Mr. McGowan was later told that Herman Moxley, a black mechanic in the Columbiana County garage, had found a noose near to his work area, and suspected that Mr. Rose was the culprit. (McGowan Deop at 149-51, 174-75). Mr. Applegarth investigated the matter briefly, then passed it to Bette Mendenhall, an investigator from ODOT's Central Office in Columbus who completed the investigation. (Applegarth Depo. at 48-54). The investigator could not determine who was responsible, and contrary to Mr. McGowan's testimony, Mr. Moxley's written statement provided to the investigator did not indicate he believed Mr. Rose, or any other specific person, to have been involved or to have had a motive. (Applegarth Depo., Ex. 2).

In 1998 or 1999, Ms. Crawley testified that Terry Hartman indicated to her that he wanted to eliminate the radio operators because he wanted the office space for his own office. (Crawley Depo. at 124). Ms. Crawley told Mr. Hartman that he was going to have to wait until she got out of there for it to be his office. *Id.* at 124. Mr. Hartman responded to her that there would be a lot of changes and that if it got too hot in the kitchen, whoever was in there had to get out of the kitchen. *Id.* at 125. Ms. Crawley believes Mr. Hartman's statements were racially motivated because she was the only one who used that office space. Mr. Hartman did not get the office and the radio operating equipment remained there. *Id.* at 127.

In the summer of 1999, Ms. Crawley was sent out on a job with John Dunkle, a crew leader. (Crawley Depo. at 143). College workers were also sent out ono this particular job. *Id.* When Ms.

Crawley arrived at the job, Mr. Dunkle took the college students out and put them on jobs. *Id*.  Ms.

Crawley says there was no job left for her to do. *Id*.  Ms. Crawley testifies that when she asked Mr.

Dunkle what to do, he told her he did not care and did not know what she was going to do. *Id*. at

144.  Ms. Crawley went and sat in the truck, put her head back and watched through the rearview

mirror. *Id*.  When Mr. Dunkle drove up behind her, she closed her eyes and reopened them as he

was walking around the truck. *Id*.  Ms. Crawley says she knew that Mr. Dunkle was going to report

her to Don Bennett for sleeping in the truck. *Id*.  Ms. Crawley claims it was obvious she was not

sleeping. *Id*.  Ms. Crawley sat in the truck for 5-10 more minutes and Don Bennett arrived.  Ms.

Crawley told Don Bennett the story about not having anything to do. *Id*. at 146-147.  Don Bennett

told the crew leader to give her something to do. *Id*. at 147.  Ms. Crawley was not given a reprimand

and did not receive any other disciplinary action. *Id*. at 147-148.

In 1999, Ms. Crawley was working traffic control and she stopped a lady on her way to the

hospital. (Crawley Depo. at 149).  Ms. Crawley refused to let her through and she became irate.  Ms.

Crawley called Rick Newbold and relayed the situation.  *Id*.  The woman told Mr. Newbold that Ms.

Crawley was not doing her job.  *Id*. at 150.  Ms. Crawley alleges that Mr. Newbold called Don

Bennett and told him that Ms. Crawley upset a driver.  *Id*.  Ms. Crawley was not punished or

disciplined and nothing happened to her as a result of this incident. *Id*. at 152.

In 1999, Ms. Crawley alleges that Mr. Bennett called her into his office, asked her to sit

down, and then leaned back and smiled at her. (Crawley Depo. at 198).  Crawley testified that she

believes he smiled at her for 30 seconds to one minute before she got up and walked out.  *Id*. at 198-

99.  Then, at 3:00 that day, as her shift was ending, Mr. Bennett came out to the garage and asked

Ms. Crawley why she left his office.  *Id*.  Ms. Crawley told Mr. Bennett it was apparent he had

nothing to say except to smile. *Id.*  Mr. Bennett then told her he did have something to say. *Id.*  Ms. Crawley told him she didn't care what it was, that it was 3:00 and she was out of there. *Id.* at 200. Mr. Bennett then yelled out to Ms. Crawley that she was supposed to report to New Philladelphia for computer classes. *Id.* at 201.  These classes were classes that Ms. Crawley had been signing up for, but that she alleges "they" were taking her name off the list. *Id.*  Ms. Crawley finally "began to raise a big squawk" and that's when "they" put her on the schedule to go to the computer classes. *Id.* at 202.  Ms. Crawley stated that she eventually attended the training. *Id.* at 201-02.  When Ms. Crawley was asked if she believed Mr. Bennett staring at her was racially motivated, Ms. Crawley responded that she did not know if it was racially motivated, but that it was harassing and she felt as though he wanted her angered. *Id.* at 203.  Ms. Crawley refused to ever enter Mr. Bennett's office again.  *Id.* at 201.  Friction developed between Ms. Crawley and Mr. Bennett and reached the point that Ms. Crawley refused to talk to Mr. Bennett without Mr. McGowan present.  (Bennett Depo. at 21-23, 115).  Defendant ODOT maintains that Mr. Bennett's less than glowing estimation of Ms. Crawley's work and her ability to get along with others is due, to a great extent, to Ms. Crawley's own admitted behavior.  (Def.'s Mot. for Summ. J. at 16).

Ms. Crawley says that she observed Mr. Safford, a custodial worker, get harassed and discriminated against.  (Crawley Depo. at 203).  Ms. Crawley says she believes this occurred because of his age, "I felt that he was discriminated [against because] he's the oldest employee in the State of Ohio." *Id.*  Ms. Crawley thought the fact that Mr. Safford didn't have a classification, didn't get a raise one year (according to him) and did menial duties such as pick up lunch and sweep floors and wash windows was degrading. *Id.* at 204.  Also, Ms. Crawley said her co-workers would move Mr. Safford's office and once moved it into the garage, which was not heated, because they

14

were trying to conserve energy. *Id*. at 209.  Ms. Crawley said Mr. Safford had a desk with a nice chair, and the superintendent decided he wanted Mr. Safford's chair, so he took it and put a chair in Mr. Safford's room that was broke and would flip him onto the floor if he didn't sit in it the right way. *Id*. at 211-12.  Ms. Crawley believes this treatment of Mr. Safford was racially motivated because he was a passive black man who didn't complain. *Id*. at 215.  ODOT points out that management was not made aware of some of the alleged harassment of Mr. Safford, and in fact, Mr. Safford himself kept telling ODOT management that he was not being harassed. (Def.'s Reply at 6 *citing* Hartman Depo. at 29-33; Bennett Depo. at Ex. 2; McGowan Depo. at 82-83, 97-99).  Mr. Safford  retired in 2000 at the age of 70.

On June 16, 2000, Ms. Crawley testified that Cory Curtis, an African-American summer student, heard Mark Beebe refer to Ms. Crawley as a "dumb nigger." (Crawley Depo. at 165).  Cory Curtis reported this to Ms. Crawley. *Id*. at 166.  Cory Curtis then reported this to Mr. Newbold who told him to take the rest of the day off, that they would pay him for the balance of the day. *Id*. at 167.  Ms. Crawley testified that Mr. Beebe then came to see her at her jobsite. *Id.*  Ms. Crawley testified that Mr. Beebe was petrified. *Id.*  Mr. Beebe asked to talk to her, admitted to calling her the name, apologized and asked her to accept his apology. *Id.*  Ms. Crawley asked Mr. Beebe why he was apologizing and if he was afraid of losing his job.  Mr. Beebe said "yes." *Id.*  Ms. Crawley told him she did not accept his apology. *Id*. at 168.  Mr. Newbold reprimanded Mr. Beebe and suspended him for one day. *Id*. at 168-69.  Ms. Crawley testified that she had no more trouble with Mr. Beebe after that incident. *Id*. at 169.

In July of 2000, Ms. Crawley testified that Pete Vain was supposed to give her a ride to the jobsite, but did not. *Id.* at 173.  Ms. Crawley caught a ride with another co-worker, and Ms. Crawley

and the other co-worker caught Pete Vain hiding out with his girlfriend. *Id*. at 173-74. Soon after, Pete Vain made two comments to Ms. Crawley including "go back where you came from" and "all you people need to go back where you came from." *Id*. at 173-176.  Ms. Crawley understood this to mean to go back to Africa; Pete Vain understood it to mean to go back to Sixth Street in Steubenville where many blacks live. *Id.*  Ms. Crawley reported either one or both of the comments to Mr. McGowan, union rep, who reported them to supervision. *Id.* at 176.  Ms. Crawley does not know what management said or did to Pete Vain. *Id.* at 178.

Soon after Ms. Crawley caught Pete Vain hiding out with his girlfriend, Pete Vain was operating a sweeping machine on the freeway and she was doing traffic control. (Crawley Depo. at 178-179).  Ms. Crawley testified that Pete Vain went past her with the sweeping machine and the machine completely covered her with dirt such that she couldn't see. *Id.* at 179.  Ms. Crawley reported this incident to Terry Hartman and told Mr. Hartman she was so angry that she would have hit Pete Vain if he got any closer to her. *Id*. at 180.  Ms. Crawley testified that Mr. Hartman replied, "do what you have to do." *Id.*  Ms. Crawley asked Mr. Hartman if he wanted her to end up like another black employee who acted out in violence and was fired, and Ms. Crawley alleges that Mr. Hartman again said "do what you have to do." *Id.*  Ms. Crawley testified that Pete Vain again covered her in dirt with the sweeping machine. *Id.*  Ms. Crawly again reported the incident to Mr. Hartman and she refused to work with Pete Vain again. *Id*. at 182.  Mr. Hartman told Pete Vain he was not allowed to go past Ms. Crawley with the machine or to even get close enough to Ms. Crawley that he could get dirt on her. *Id*. at 182-183.  Pete Vain never went past Ms. Crawley with the sweeping machine after this, but Ms. Crawley alleges that  twice more Pete Vain got "as close as he dared" without causing the dust to completely cover her. *Id*. at 183.  For a third time, Ms.

16

Crawley reported to Mr. Hartman and Mr. McGowen that Pete Vain was coming close with his sweeping machine. *Id*. at 184.  This time, Mr. Hartman took Pete Vain off the job.  *Id*. at 184-185.  Ms. Crawley did not have any more trouble with Pete Vain after this.  *Id.* at 185.

There are four instances or groups of instances in which Ms. Crawley claims she was denied overtime.  (Crawley Depo. at 47-48; Crawley Depo. Ex. 3 at 13-14).  On each occasion, Ms. Crawley filed a grievance, and on each occasion, that grievance was settled. *Id.*; (Crawley Depo. at 34-37, 40-41; Crawley Depo. Exs. 9-12).

The collective bargaining agreement in effect from March 1, 1997 through February 29, 2000, provided:

> Insofar as practicable, overtime opportunity hours shall be equitably distributed on a rotating basis by seniority among those who normally perform the work defined in [sic] overtime, and if a sufficient number of employees is not secured through the above provisions, the Employer shall have the right to require the least senior employee(s) who normally performs the work to perform said overtime . . . .

(Crawley Depo. at 70-71; Crawley Depo. Ex.16 at 392-93).  The corresponding provision of the successor agreement provided:

> Insofar as practicable, overtime opportunity hours shall be equitably distributed on a rotating basis by seniority among those who normally perform the work as defined in the classification specification and/or position description.  In the event the Employer has determined the need for overtime, and if a sufficient number of employees is not secured through the above provisions, the Employer shall have the right to require the least senior employee(s) who normally performs the work to perform said overtime . . . .

(Crawley Depo. at 69-70; Crawley Depo. Ex.15 at 227).

During most of Ms. Crawley's employment with ODOT, Virgnia Bonomo was the regular two-way radio operator for the Wintersville Garage during the day shift.  Ms. Bonomo also operated the radio on other shifts on an overtime basis.  (Crawley Depo. at 56-57).

17

In November of 1993, Ms. Bonomo became ill and, after filing a grievance, Ms. Crawley took over her duties. Ms. Crawley was given a temporary working level increase to Radio Operator 5 along with a pay increase from November of 1993 to December of 1994. *Id.* at 14-15. Though Ms. Crawley remained a HW1, she considered herself entitled to replace Ms. Bonomo during miscellaneous absences as her "backup." *Id.* at 57.

During the construction season, the two-way radio was staffed eight hours per day, when most of the employees were at work and on the roads. From the time Ms. Crawley started at ODOT until 2001, the Wintersville Garage staffed its two-way radio around the clock during "snow and ice season." "Snow and ice season" typically ran from November or December to early or mid-April, as declared by the County Manager. (Newbold Depo. at 54). When this arrangement was in place, Ms. Bonomo operated the radio during the day, Ms. Crawley operated it over the night shift, from 11:00pm to 7:00am, and two so-called "thousand hour transfers" from other departments watched the radio during the afternoon shift. (Crawley Depo. at 63-64; Bennett Depo. at 48-49; Newbold Depo. at 51-53). These included Ernie Fleshman and Rick Piskorik, who were both Project Inspectors. Fleshman was black, Piskoirk white. (Newbold Depo. at 100-02) Ms. Crawley had volunteered to work the night shift, and the assignment gave Ms. Crawley something to do, since she could not operate heavy snow removal equipment. (Bennett Depo. at 47). Unless a snow and ice emergency was occurring, Ms. Crawley had next to nothing to do during the night shift. (Hartman Depo. at 14-15).

Ms. Crawley filed two grievances in 1996. The first is unrelated to the radio operation and claims that Ms. Crawley was not offered overtime in the proper rotation, when overtime was required as the result of a highway accident. This grievance was settled, a settlement agreement

18

signed and Ms. Crawley received a monetary payment. (Crawley Depo. at 34). Ms. Crawley's second overtime grievance in 1996 alleged that ODOT was aware that the regular radio operator would be absent for a long period of time, but that the employer failed to fill the "vacancy" as had been done in the past. The apparently referred to the prior occasion when Ms. Crawley received a temporary working level increase when Ms. Bonomo was ill. Again, the grievance was settled and Ms. Crawley received a monetary payment. (Crawley Depo. at 34-35).

In the late 1990's, Payroll Clerk Pam Vanezalos and Storekeeper Evelyn Parise were also utilized to operate the radio on days when Ms. Bonomo was absent. (Crawley Depo. at 58-60; Bennett Depo. at 52). Mses. Bonomo, Vanezalos and Parise were white. (Bennett Depo. at 49).

Mr. Bennett planned to offer overtime to Ms. Bonomo first, because she was the regular operator, and then rotate any remaining opportunities among Mses. Crawley, Vanezalos and Parise, since all of them "normally perform[ed] the work." (Bennett Depo. at 52-53, 54-56, 71). Ms. Crawley claimed at this point, she was receiving no or next to no overtime. ( Crawley Depo. at 67-68; 71-72).

On January 22, 1999, Ms. Crawley filed her third grievance. Ms. Crawley claimed that the contract was violated because Mses. Vanezalos and Parise were offered overtime in rotation with her. Ms. Crawley argued that she should have right of second refusal for all overtime opportunities turned down by Ms. Bonomo, and that Mses. Vanezalos and Parise should have overtime opportunities only when both Ms. Bonomo and Ms. Crawley had refused them. On June 8, 1999, at a mediation conducted before the case was scheduled for arbitration, a settlement agreement was signed that provided in relevant part:

> (1)  Jefferson County ODOT Radio Operator Virginia Bonomo will be the first
>       to be offered overtime opportunities on the radio.

      (2)     Maria Crawley will be offered the overtime opportunities on the radio 2nd when she is permanently assigned radio operator duties (night watchman).

(Crawley Depo. at 36-37; Flynn Depo. 8-9; McGowan Depo. 44-46; Crawley Depo. Ex. 11).

Defendant ODOT points out that this resolution did not necessarily square with the contractual language governing overtime because there does not appear to be any contractual basis to discriminate against any of the four radio operators to treat Ms. Crawley more favorably. (Def.'s Mot. for Summ. J. at 23). ODOT continued to explain the settlement agreement by quoting Mr. Applegarth: "[O]nce we get to . . . the mediation process, we let the union tell us who they wanted to work. We were in a lose-lose situation here . . . . They set the policy." (Applegarth Depo. at 67).

In March, 2000, Ms. Bonomo left the Wintersville Garage for a position at District 11 headquarters. By this time, ODOT had made a decision to eliminate full-time radio operator positions as wasteful. (Newbold Depo. at 112). In lieu of hiring a full-time replacement, radio receivers were placed in the offices of Payroll Clerk Pam Vanezalos and Storekeeper Evelyn Parise, who dealt with incoming calls during day shift hours while attending to their desk duties.

Mr. Newbold did not consider making Ms. Crawley the full-time radio operator because ODOT was eliminating radio operator positions. (Newbold Depo. at 112). There was no evident blend of HW1 duties and radio operator desk duties, whereas Mses. Vanezalos and Parise could watch the radio while doing their regular jobs. *Id*. at 113. In fact, for greater efficiency, ODOT currently uses storekeepers and account clerks to operate two-way radios in most counties. District 11 has only one radio operator left, and that position will be eliminated when the incumbent retires. (Flynn Depo. at 11). ODOT points out that this again changed the overtime rotation situation because Ms. Bonomo was no longer first in line, and there was no full-time radio operator in the Wintersville Garage. (Def.'s Mot. for Summ. J. at 24, *citing* Flynn Depo. at 11).

On January 19, 2001, Ms. Crawley filed her fourth and final grievance claiming overtime discrimination. In this grievance, Ms. Crawley asserted that ODOT had breached its 1999 settlement agreement with her by not offering her the right of second refusal ahead of Mses. Parise and Vanezalos, who, at that time, were splitting Ms. Bonomo's old duties and who were consequently given the right of first refusal. This grievance was settled at mediation on October 19, 2001. (Crawley Depo. at 40-41). This agreement provided:

(1)    The grievant shall receive 24 hours of pay at the appropriate rate.

(2)    If the grievant is assigned permanently during the snow and ice season, she shall be in the rotation for o.t. with other radio operators.

Mr. Newbold decided in late 2001, before the settlement of Ms. Crawley's 2001 grievance, that it was unnecessary to have someone on duty listening to the radio 24 hours a day during the snow and ice season. (Newbold Depo. at 96; Flynn Depo. at 13-14). Previously, Mr. Newbold had only a few other supervisors assisting him, so that if there was no 24-hour operator, Mr. Newbold would have been on call most of his off-duty time. By 2001, Mr. Newbold had two assistants, so that being on call could be rotated among three people. A radio operator would be called out only if an off-hours emergency arose. (Newbold Depo. at 97-99). Mr. Newbold simply wanted fewer people doing nothing in the middle of the night: "I needed more people working on the roads." (Newbold Depo. at 99). This is the current arrangement (no 24-hour radio operator) for the Wintersville Garage. (Newbold Depo. at 117-18).

This decision to eliminate the 24-hour radio operator during the snow and ice season affected Ms. Crawley and also the two 1000-hour transfers Mr. Fleshman and Mr. Piskorik. Mr. Piskorik was given highway maintenance duties and Mr. Fleshman and Ms. Crawley were given traffic control duties. (Newbold Depo. at 100-104). Ms. Crawley actually performed some traffic control

21

duties during the early 2001 through 2002 snow and ice season until she went on leave in November, 2001. (Newbold Depo. at 108).

Ms. Crawley thinks that ODOT's distribution of overtime opportunities was discriminatory because Mr. Bennett took "her" overtime away and gave some of it to Mses. Vanezalos and Parise after these two women began to share in radio operation duties. (Crawley Depo. at 52-53). Mr. McGowan claims the overtime denial was race-based because Mses. Parise and Vanezalos had to go to less trouble to get their overtime opportunities than Ms. Crawley, who had to file grievances, and that Ms. Crawley was characterized as a troublemaker for having done so. (McGowan Depo. at 53-55, 57-59). Defendant ODOT points out that the actual grievances that Ms. Crawley filed did not seek to have Ms. Crawley be treated equally to Mses. Parise and Vanezalos, who also operated the radio, but to be treated better than them. (Def.'s Mot. for Summ. J. at 26).

Mr. McGowan claims that "John" in Belmont County and "Miriam" in Columbiana County still operate the radio during snow and ice season, even though they are HW2's with CDL's. (McGowan Depo. at 155-57, 178-181). Defendant ODOT points out, however, that those counties still maintain 24-hour radio coverage during snow and ice season and Jefferson County does not. (Def.'s Mot. for Summ. J. at 26, *citing* Applegarth Aff., ¶ 6)

Plaintiff claims that after the radio operator position was eliminated, she was told that she would have to operate a dump truck during the snow and ice season if she wanted to receive any overtime. (Pl's Memo. in Opp. at 17). Ms. Crawley testified that in the summer of 2001, her crew leader told her she would have to learn how to drive a dump truck. (Crawley Depo. at 239). Ms. Crawley refused, said she was going home, and expected to be disciplined. *Id*. At 239-240. The crew leader called Mr. Applegarth, and Ms. Crawley was put on the phone with Mr. Applegarth,

who explained that Ms. Crawley could not be disciplined because a crew leader was not a true supervisor, and that Mr. Hartman could not order Ms. Crawley to drive a heavy truck because she was untrained.  *Id.* at 238-241.  Mr. Applegarth further explained that Ms. Crawley would have to be trained by a professional in a training program, not someone on the job. *Id.* at 241.

At this time, Ms. Crawley alleges that Mr. Hartman kept trying to find out from Ms. Crawley what kind of CDL she had, but that Ms. Crawley responded that it was "none of his business."  Ms. Crawley says she feared that the other employees would claim disparate treatment if Ms. Crawley were excused from heavy equipment operations although she had a CDL.  *Id.* at 226-227.

ODOT claims that any effort to discuss heavy equipment operation with Ms. Crawley essentially went in circles. (Def.'s Mot. for Summ. J. at 27).  Mr. Newbold stated that he offered to provide training to her in Jefferson County, but that Ms. Crawley said she wanted more formal training, but that Ms. Crawley did not really want this either. (Newbold Depo. at 106-107).  Mr. Newbold states that in the latter part of 2001, he called Ms. Crawley into his office on multiple occasions and told her, "we need you as a truck driver," and offered to provide heavy equipment training in Columbus, as well as a promotion to HW2. (Newbold Depo. at 107, 109-110; Crawley Depo. at 154-56, 241; Hartman Depo. at 48).   Mr. Newbold said Ms. Crawley may also have been told this by District 11 Business and Human Resource Administrator, Ken Engstrom, because this was part of ODOT's overall plan to improve its wintertime efficiency by eliminating as many HW1 positions as possible.  (Newbold Depo. at 104-105).  The plan was to post enough HW2 positions to promote all HW1's who could be used as wintertime truck drivers.  (Applegarth Aff. ¶ 7).

Ms. Crawley had a CDL but considered herself untrained in heavy equipment operation. (Crawley Depo. at 73).  She told Mr. Newbold that she felt that at the age of 60, it was a little late

to learn to do new things. Ms. Crawley states that she considered Mr. Newbold's offer a "death trap." (Crawley Depo. at 154-155). Mr. Whanger had told her that her coworkers would let her drive the "easy" roads, but Ms. Crawley viewed all Jefferson County roads as bad – one could fall "over an embankment thousands of feet over." (Crawley Depo. at 223-224). Ms. Crawley admits that she cannot give any specific reasons why she believes them asking her to learn to drive a truck was racially motivated.

Ms. Crawley testified that one of her co-workers, Evelyn Parise, designed a petition that was filed against her and was aimed against her to make her be a truck driver. (Crawley Depo. at 224). The petition was dated October 23, 2001 and provided:

> We, the undersigned feel that there has been dispare [sic] treatment taking place with the Highway Maintenance Worker series.
>
> This dispare [sic] treatment takes place when calling out for overtime. The H.M.W. 1 series in Jefferson County is not being utilized, called or charged for overtime as the rest of the H.M.W. series is being utilized, called or charged for overtime.
>
> We feel the remedy to this situation would be to treat all of the H.M.W. series as equals. All should be called, and or charged accordingly.

(Crawley Depo. Ex. 22). The petition was signed by 15 of Ms. Crawley's co-workers, but not Ms. Parise. Ms. Crawley testified that she learned Ms. Parise put together the petition so that Ms. Crawley would have to drive a truck to get overtime instead of taking overtime on the radio. *Id*. at 227. Ms. Crawley said that supervision did not act on the petition. *Id*. at 228. Ms. Crawley testified that she believed the petition was racially motivated on Ms. Parise's part. *Id*. at 229. When asked why she believed it was racially motivated on Ms. Parise's part, Ms. Crawley explained, "[s]he just didn't like me for whatever reason" and that when she first started at ODOT, and would walk in and say "[h]i everybody," and ask how everyone was doing, that Ms. Parise would not respond. *Id*. at

231. Ms. Crawley testified that one day she took Ms. Parise aside and said to her, "Do you have a problem with me or – or is it because I'm black or is it  – is it because I'm just here?  I don't understand.  You don't know me.  You never saw me before.  And its just courtesy to – when someone – for someone to say good morning, to say good morning back . . . ."  *Id.* at 232.  Ms. Crawley testified that Ms. Parise responded, "Oh, you know what?  I don't know why I don't do that.  I just never paid – never paid any attention to it." *Id.*   After this conversation, Ms. Parise became more pleasant. *Id.*  Nevertheless, Ms. Crawley states that after this she "always thought that she was prejudiced." *Id.*  With respect to the other signors of the petition, Ms. Crawley states that she did not believe it was racially motivated because she worked with the guys everyday and it was a good relationship and they all basically got along very good every day. *Id.* at 233.

During the October 19, 2001, mediation at which her last overtime grievance was settled, Ms. Crawley and Mr. Flynn had a conversation about heavy equipment operation, the nature of which is disputed.  Everyone agrees that the conversation began about Ms. Crawley's overtime opportunities; that is, that because the 24-hour radio operations were being eliminated, Ms. Crawley's opportunity for overtime during the snow and ice season could come through operating snow and ice removal equipment. (McGowan Depo. at 62-64; Flynn Depo. at 14-15; Applegarth Depo. at 79-80).

According to Ms. Crawley, Mr. Flynn asked her whether she was going to become a truck driver and that Ms. Crawley responded that she would not.  Mr. Flynn then said, "you will become a truck driver because you won't have your job as a dispatcher."  Ms. Crawley claims that Mr. Flynn then stated that "Oh, you will drive the truck. And the first scratch you put on the truck, you're going to be gone." (Crawley Depo. at 187). Ms. Crawley testified that she did not know who Mr. Flynn

is or what role if any he has in initiating or recommending discipline. *Id.* at 188.  Ms. Crawley testified that she did not believe management could fire her for putting a scratch on the truck. *Id.* at 190.  Ms. Crawley  claims she believed these statements were racially motivated because she "just felt it."  *Id.*  Mr. McGowan agrees with most of Ms. Crawley's version of the conversation except that Mr. McGowan testified that after he argued it would be hard to retrain Ms. Crawley at her advanced career stage, Mr. Flynn said, "If she's thinking about wrecking the truck . . . that she would no longer be employed with ODOT.  (McGowan Depo. at 22-23, 50, 60-61, 67-68).  Ms. Crawley says she considered Mr. Flynn's comments to be threats.  (Crawley Depo. at 189).

According to Mr. Flynn and Mr. Applegarth, their message was that Ms. Crawley had to operate heavy equipment *if* she wanted significant overtime opportunities during the snow and ice season.  (Flynn Depo. at 18-19, 20-21; Applegarth Depo. at 79-80).  The issue of discipline was raised by Ms. Crawley who asked what would happen if she got into an accident plowing snow.  Mr. Flynn explained the difference between at-fault and no-fault accidents and told Ms. Crawley that she could be disciplined (most likely reprimanded) for the former.  (Flynn Depo. at 16, 19, 20; Applegarth 81-82).

Ms. Crawley testified that when she asked them "what if I don't become a truck driver," they told her "we don't know what you're going to do." (Crawley Depo. at 150-153).  Ms. Crawley speculated that, if she did not drive a truck, she would become a Robert Stafford, someone just in a garage with no classification, sweeping floors, picking up paper, emptying wastebaskets. *Id.* at 153.  Ms. Crawley testified that her nerves were a mess, she'd been through a lot of harassing, and she would rather starve than do the duties Robert Stafford did. *Id.*  She felt her only alternative to doing the duties Robert Stafford did was to drive a truck or retire. *Id.* at 153.

Ms. Crawley claims that as the snow season approached, the uncertainty regarding her job duties caused her "nerves" to become "shot." Ms. Crawley's doctor advised her that "stress" was adversely affecting her health, and she quit reporting to work about November 16, 2001. Ms. Crawley first applied for and received disability leave benefits, and then retired in February, 2003. (Crawley Depo. at 15-16, 233-37).

On May 20, 2002, Ms. Crawley filed a charge with the OCRC. Ms. Crawley's OCRC Charge of Discrimination stated that the alleged discrimination began on October 19, 2001, and ended on November 1, 2001. Neither the retaliation or the continuing action boxes were checked. The body of the charge stated:

> I am a Black female. I currently hold the position of Highway Worker I. For the past three years I have been denied overtime. On or about October 19, 2001, Ed Flinn [sic] threatened me, stating that I would become a truck driver, and the first scratch I got on the truck I would be gone. On or about November 1, 2001, management eliminated my position of Dispatcher.
>
> I believe I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Crawley Depo. at 18-19; Ex. 4).

Ms. Crawley received her right to sue letter shortly after July 30, 2002. (Crawley Depo. at 30, Ex. 8).

## II.  SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, Depo.sitions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[2] The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era"

---

[2] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

in summary judgments.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989).  The court in *Street* identified a number of important principles applicable in new era summary judgment practice.  For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment.  *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Id., quoting Liberty Lobby*, 477 U.S. at 257.  The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion.  *Id.*  It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'"  *Id., quoting Matsushita*, 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Id.* at 1479-80.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III. DISCUSSION

Ms. Crawley alleges that she was subject to discrimination, a hostile work environment and was retaliated against in violation of Title VII of the Civil Rights Act of 1964**.**  Defendant ODOT argues that it is entitled to summary judgment on each of Plaintiff's claims.  The Court will first address ODOT's arguments in support of its contention that it is entitled to summary judgment with respect to Ms. Crawley's discrimination claims.  Next, the Court will turn to the alleged retaliation

claim.  Finally, the Court will address Defendant ODOT's arguments in favor of summary judgment as they relate to Ms. Crawley's hostile environment claim.

### A.    *Prima facie* **case of race discrimination**

The Court finds that Ms. Crawley has not presented direct evidence of discrimination.  There is no indication that unlawful discrimination motivated Defendant ODOT to eliminate Ms. Crawley's position of night-time radio dispatcher during the snow and ice season and re-assign her.  Consequently, the Court will now determine whether plaintiff has presented a *prima facie* case of race discrimination under *McDonnell Douglas*.  Defendant ODOT argues that Plaintiff cannot establish a *prima facie* case of race discrimination because: (1) she suffered no adverse employment action; and (2) she cannot establish that she was treated differently from similarly-situated persons outside of her protected class.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(A)(1).  In a race discrimination action, the plaintiff may prove discrimination by direct evidence or by establishing a *prima facia* case.  The elements of a *prima facia* case of employment discrimination based on race are: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff was qualified for the position; (3) that the defendant subjected the plaintiff to an adverse employment action; and (4) that the defendant did not subject similarly situated persons outside the protected class to such adverse action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the plaintiff establishes

a *prima facie* case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *See Id.*; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the defendant comes forward with a legitimate, non-discriminatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination. *See Id.*; *Burdine*, 450 U.S. 248, 253. "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S.248, 253.

It is uncontroverted that Plaintiff belongs to a protected class, and ODOT does not argue that Ms. Crawley was unqualified to maintain her position of HW1. The parties dispute, however, whether Plaintiff has proved the final two elements of a *prima facie* case: (1) whether the Plaintiff was subject to an adverse employment action; and (2) whether ODOT subjected similarly situated persons outside the protected class to adverse action. Finally, Defendant ODOT contends that even if Ms. Crawley is able to establish a *prima facie* case of race discrimination, she is unable to meet her burden to prove that ODOT's proffered reason for its actions is a mere pretext for discrimination.

### 1. Adverse employment action

Ms. Crawley first argues that ODOT's threats of termination and the elimination of her position resulting in her reassignment with significantly different duties (rising to the level of a constructive discharge), constitute adverse employment actions. (Pl's Memo. in Opp. at 40-41). This Court disagrees and finds that Ms. Crawley has failed to create a genuine issue of material fact that she suffered an adverse employment action.

The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms and conditions of [plaintiff's] employment because of [the] employer's conduct." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004), *quoting Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Hollins*, 188 F.3d at 662. "Examples of adverse employment actions include firing, failure to promote, reassignment with significantly lower responsibilities, a material loss of benefits, suspensions, and other indicies unique to a particular situation." *Smith*, 378 F.3d at 575-76, *quoting Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

The Sixth Circuit has held that a threat of termination does not qualify as an adverse employment action. *Plautz v. Potter*, 156 Fed.Appx. 812, 817 (6th Cir. 2005), *citing Hollins* 188 F.3d at 662 ("[Employer's] threats to discharge or discipline [employee] were not adverse employment actions because it is settled in this circuit that a threat to discharge is not an adverse employment action."). This is especially so when there is no evidence that the speaker had the authority to act upon the threat. *See Hollins*, 188 F.3d at 662. Here, the alleged threat – that Ms. Crawley would be terminated if she were to put a scratch on a truck – was made by Mr. Flynn, a spokesperson at mid-level grievance proceedings. Ms. Crawley testified that she did not know who Mr. Flynn was or what, if any, authority he had to initiate or recommend discipline. (Crawley Depo. at 188). Further, Ms. Crawley's testimony revealed that she did not believe Mr. Flynn's threat to be viable even if he was in management. *Id.* at 190. Accordingly, this Court finds that Mr. Flynn's alleged threat does not amount an adverse employment action.

32

Next, Ms. Crawley argues that ODOT's elimination of the 24-hour radio dispatcher position during the snow and ice season, and her consequent reassignment amounted to a constructive discharge constituting the required adverse action. (Pl's Memo. in Opp. at 41-42).

A finding of constructive discharge requires employment conditions to be objectively intolerable to a reasonable employee.  *Smith v. Henderson*, 376 F.3d 529, 533-534 (6th Cir. 2004). In *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001), the Sixth Circuit held that the following factors should be considered in determining whether or not there has been a constructive discharge: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.  Further, a plaintiff claiming constructive discharge must also demonstrate that the employer deliberately created such conditions "with the intentions of forcing [the plaintiff] to quit." *Logan*, 259 F.3d at 568-68; *see also, Yates v. Avco Corp.*, 819 F.2d 636-37 (6th Cir. 1987).

Defendant ODOT points out, and this Court agrees, that *none* of the *Logan* factors existed in the present case. (Def.'s Mot. for Summ. J. at 44).  Ms. Crawley, in her Memorandum in Opposition, does not dispute ODOT's contention that the *Logan* factors are absent, but instead argues that Defendant ODOT's elimination of the 24-hour radio station during the snow and ice season, and her subsequent re-assignment, under the circumstances, was "tantamount to telling her that it was time to retire." (Pl's Memo. in Opp. at 42).

It is true that an employer's re-assignment of an employee can, under certain circumstances,

33

rise to the level of a constructive discharge constituting an adverse action. *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002).  In order to demonstrate a constructive discharge due to reassignment, however, the proffered employment options must have been "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991).  An employee's "subjective impressions as to the desirability of one position over another' is insufficient to render an employer's action materially adverse." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004), *quoting Policastro*, 297 F.3d at 539; *see also O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004).

In the present case, when Ms. Bonomo (the radio operator) left the Wintersville Garage, ODOT eliminated the position she held as wasteful.  Instead, radio receivers were placed in the offices of two employees who had desk jobs and were able to continue to do their regular jobs while attending to incoming calls throughout the day.  This efficiency-based decision was consistent with ODOT's current practices in most counties.  ODOT also eliminated the 24-hour radio operations during snow and ice season as wasteful.  This restructuring meant that Ms. Crawley, during the snow and ice season, would need to be re-assigned.[3]  Defendant ODOT needed more truck drivers so it offered to provide Ms. Crawley with heavy equipment training in Columbus, as well as a promotion to HW2.  Ms. Crawley testified that when she asked Defendant what she would do if she did not become a truck driver, that Defendant responded that it did not know what she was going to do. (Crawley Depo. at 150-153).  Ms. Crawley continued to speculate that she if she chose not to drive

---

[3]Two other individuals, Mr. Fleshman and Mr. Piskorik were also affected by ODOT's decision to eliminate the 24-hour radio operator during the snow and ice season.  Mr. Fleshman was given highway maintenance duties and Mr. Piskorik was given traffic control duties.

a truck, that she would become a Robert Stafford (custodial employee), with no classification, sweeping floors, picking up paper, emptying waste baskets. *Id*. at 153.[4]  Ms. Crawley further testified that she "would rather starve" than do these types of duties; she felt her choice was to drive a truck or retire. *Id.* at 153.[5]

Based upon the foregoing analysis articulated in *Smith, Logan, Policastro, Wilson* and *Mitchell*, this Court finds that Ms. Crawley has been not constructively discharged.  Though ODOT's restructuring to eliminate the 24-hour radio operator position during the snow and ice season meant that Ms. Crawley would not be operating the radio in the winter, Ms. Crawley has offered no evidence that her new duties were going to be so unpleasant that a reasonable person in her shoes would have felt compelled to resign.  "Changes in employee responsibilities or authority, triggered by the company reorganization, without more, do not amount to intolerable conditions constituting constructive discharge." *Keller v. Allstate Insurance Company*, 146 Fed.Appx. 764, 765 (6th Cir. 2005) *citing Curtis v. Hanger Prosthetics & Orthotics, Inc.*, 101 Fed.Appx. 61, 64-66 (6th Cir. 2004).  ODOT offered to promote Ms. Crawley from her position of HW1 (laborer) to a HW2

---

[4]Mr. Stafford, did, in fact have a classification as a Custodial Worker.  (Applegarth Aff., Ex. 4).  Further, the Court finds that even if Ms. Crawley was re-assigned to custodial work (which she was not), this would not amount to an adverse action because her classification, HW1, includes in its description an array of job duties which included custodial work. (Applegarth Aff., Ex. 3 at 3).

[5]Though Plaintiff, in her Memorandum in Opposition, insists that her only alternative to retirement was to drive a truck and be trained to drive that truck by Mr. Petrisko, Ms. Crawley's Deposition testimony makes clear that this was a self-created, false dilemma and also that, if she did choose to get training, that the training would be through a professional program. *Id*. at 150-153, 241.  Additionally, Plaintiff, in her Memorandum in Opposition, states that her nerves were shot from the "many discriminatory hardships" at ODOT, yet Ms. Crawley's Deposition testimony revealed that she had a great working relationship with her co-workers at ODOT and that she got along well with most everyone and that her nerves became shot due to the uncertainty surrounding her job as the snow season approached, not because of any alleged discriminatory hardships.

and to train her to do the duties associated with a HW2. This Court finds that a reasonable employee would not find this to be intolerable. Ms. Crawley's subjective impressions as to the desirability of the HW2 position over her former position are insufficient to render ODOT's action materially adverse. Ms. Crawley's unsupported speculation that her duties would be custodial in nature should she turn down ODOT''s offer to drive trucks is also insufficient to support a finding by this Court of a materially adverse action.

Accordingly, this Court finds that Ms. Crawley has failed to create a genuine issue of material fact that she suffered an adverse employment action.

### 2. Treatment different than similarly situated employees

To establish the fourth element of a *prima facie* case, Ms Crawley must establish that all relevant aspects of her employment situation were "nearly identical" to those of the employee who was allegedly treated more favorably. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). To be deemed "similarly situated" the comparable employee "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In determining whether an allegedly comparable employee is similarly situated, the ultimate question is whether "all of the *relevant* aspects of [her] employment situation were 'nearly identical' to those of the [comparator's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998).

Ms. Crawley argues that she was similarly situated to "[m]ost, if not all, white employees at the Wintersville Garage" and that "[n]o white employee in the Wintersville garage was forced to

change positions or retire" and also that "[n]o white employee was told that his or her job responsibilities would have to change substantially in order to remain employed." (Pl's Memo. in Opp. at 43).  Defendant ODOT asserts that Ms. Crawley's was not similarly situated to most of the white employees at the Wintersville Garage because she was one of the only HW1's, and one of the only persons with a CDL who refused to operate heavy equipment.  (Def.'s Reply at 20).

This Court finds that Ms. Crawley has failed to show that she was treated differently from similarly situated co-workers for several reasons.  First, for the reasons cited by Defendant ODOT, she is not similarly situated to "most, if not all white employees at the Wintersville Garage."  Second, contrary to her allegations, she was not the only employee whose winter duties were affected by ODOT's decision to eliminate the 24-hour radio operator position during snow and ice season.  Whereas Ms. Crawley operated the radio during snow and ice season from 11:00 p.m. to 7:00 a.m., Mr. Piskorik, a white employee, operated the radio during the afternoon shift during the snow and ice season.  Thus, Mr. Piskorik, like Ms. Crawley, was affected by ODOT's elimination of the 24-hour radio operator position during the snow and ice season.  Mr. Piskorik was given traffic control duties.[6]  Finally, to the extent Ms. Crawley was treated differently from similarly situated employees, she was treated deferentially as she was one of the only employees with a CDL who was being excused from operating heavy equipment. *(See* Crawley Depo. at 226-27).[7]

Accordingly, this Court finds that Ms. Crawley has failed to create a genuine issue of

---

[6]Mr. Newbold testified that these were the same duties Ms. Crawley actually performed during the early 2001 through 2002 snow and ice season until she went on leave in November, 2001.  (Newbold Depo. at 108).

[7]Ms. Crawley testified that she told Mr. Hartman that it was "none of his business" when he asked her what kind of CDL she had because she feared that the other employees would claim disparate treatment if she were excused from heavy equipment operations although she had a CDL.  (Crawley Depo. at 226-27).

material fact that she was treated differently from similarly situated employees.

### 3. Pretext

Defendant ODOT argues that even if Ms. Crawley had made a *prima facie* case of discrimination, that ODOT had a legitimate, non-discriminatory reason for eliminating the dispatcher position and that Ms. Crawley identifies no evidence that ODOT's explanation for its actions was pretextual. (Def.'s Reply at 20). This Court agrees.

"An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). "In challenging an employer's action, an employee `must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.'" *Id.* (*quoting Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)).

In examining whether the stated reason is pretext, the Court must determine whether the employer reasonably relied on the particularized facts before it at the time it made the employment decision. *Smith*, 155 F.3d at 807. The employer is not required to show that it left no stone unturned; rather, the issue is whether the employer made a reasonably informed and considered decision before taking the adverse employment action. *Id.* The Court should

not blindly accept the proffered reason as honest. *Id.*  If the employee adduces evidence establishing that the employer failed to make a reasonably informed and considered decision, then its decisional process is "unworthy of credence," and any reliance by the employer on such a process cannot be deemed "honestly held." *Id.* at 807-08.

Here, Defendant ODOT has articulated legitimate, non-discriminatory reasons for eliminating the 24-hour radio operator position during the snow and ice season.  That is, it was an efficiency-based decision and also consistent with ODOT's current practices in most counties.  ODOT sought to have Ms. Crawley operate trucks and to promote her to HW2 because it needed more truck drivers.

In her Depo.sition, Ms. Crawley could not give any specific reasons why she believed ODOT's asking her to learn to drive a truck was racially motivated.  With respect to the alleged threat from Mr. Flynn, Ms. Crawley claimed it was racially motivated because "she just felt it."

Plaintiff's subjective impressions and conclusory statements are not enough to maintain a claim of race discrimination. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-585 (6th Cir. 1992) (rumors, conclusory allegations and subjective beliefs set forth in plaintiff's affidavit are insufficient to create a genuine issue of material fact).  The Sixth Circuit has held that an unsubstantiated belief of discrimination does not rise to the level of a "scintilla" of evidence. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) ("mere personal beliefs, conjecture and speculation are

insufficient to support an inference of age discrimination."); *see also Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996) (holding that "intuition," and likening the discrimination to "one of those things you just feel" based on "body language" and "vibes" fails to exceed the scintilla threshold to prevent summary judgment).  Ms. Crawley has therefore failed to produce any evidence of race discrimination other than her subjective beliefs.

**Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to adduce evidence from which a rational trier of fact could reasonably infer that ODOT's proffered reasons had either no basis in fact or were not the actual reason for the alleged adverse action.  Thus, Ms. Crawley is unable to establish pretext as a matter of law.  For this reason, Defendant ODOT is entitled to summary judgment in its favor on Plaintiff's Title VII race discrimination claim.**

**B.**    ***Prima facie* case of retaliation**

Ms. Crawley, in her Amended Complaint, alleges that ODOT "engaged in continuing discriminatory practices against plaintiff . . . because plaintiff complained about racially discriminatory practices."  (Compl. at ¶ 3).  Ms. Crawley, however, in her Memorandum in Opposition, presents no evidence or argument in support of her retaliation, and thus appears to abandon this claim.  Regardless, the Court finds that Ms. Crawley cannot set forth a *prima facie* case of retaliation.

Title VII prohibits an employer from retaliating against an employee who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

this subchapter." 42 U.S.C. § 2000e-3(a). The elements of *prima facie* case of retaliation are:

> (1) that he engaged in activity protected by Title VII; (2) that the defendant knew of this exercise of his protected rights; (3) that the defendant consequently took an employment action adverse to plaintiff; and (4) that there is a causal connection between the protected activity and the adverse employment action.

*Stouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001); *see also Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.*, 783 F.2d 50, 54 (6th Cir. 1986) *cert. denied*, 478 U.S. 1006 (1986). A plaintiff may satisfy the participation element of a *prima facie* case for retaliation by showing he reasonably believed his activity was protected. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

Defendant ODOT claims that Ms. Crawley's retaliation claim must be barred for failure to include it in her OCRC charge. (Def.'s Mot. for Summ. J. at 44). Retaliation claims, like all discrimination claims brought under Title VII in federal court, must be administratively exhausted. *Brown v. Gen Servs. Admin.*, 425 U.S. 820, 832 (1976). "The requirement, however, is not meant to be overly rigid, nor should it 'result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading.'" *Randolph v. Ohio Dep't of Youth Services*, 453 F.3d 724, 732 (6th Cir. 2006), *quoting EEOC v. McCall Printing Co*, 633 F.2d 1232 (6th Cir. 1980). Consequently, "the scope of the EEOC complaint should be liberally construed to encompass all claims 'reasonably expected to grow out of the charge of discrimination.'" *Id., quoting Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992); *see also, Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 546-47 (6th Cir. 1991). Accordingly, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on the claim." *Davis v. Sodexho Cumberland College Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998).

41

It is true that Ms. Crawley failed to check the retaliation box[8] on her OCRC charge, and also that she failed to explicitly allege retaliation in the body of her charge. Ms. Crawley, however, did not have an attorney present when filling out the charge and based upon this fact, this Court is required to give a broad reading of the charge. *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 832 (6th Cir. 1999), *citing Cameran v. Board of the Hillsboro, Ohio, City School District*, 795 F.Supp. 228 (S.D. Ohio 1991). The charge filed by Ms. Crawley first alleges she was denied overtime for 3 years and then that she was threatened to be terminated, and that ultimately, Defendant ODOT eliminated her position. Based upon these allegations, it is reasonably foreseeable that the EEOC would be prompted to investigate whether or not the alleged elimination of Ms. Crawley's position was in retaliation for her complaints about the alleged denial of overtime. *See Duggins*, 195 F.3d at 833 ("[R]etaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim foreseeable to defendants . . . ."). Therefore, the Court finds that Ms. Crawley's retaliation claim is not barred for failure to exhaust her administrative remedies.

Though the Court rejects Defendant ODOT's arguments that the retaliation claim is barred due to failure to exhaust administrative remedies, the Court finds that the retaliation claim fails on its merits. Based on the Court's analysis in III.A.1, *supra*, the Court finds that Ms. Crawley has failed to create a genuine issue of material fact that she suffered an adverse employment action as is required to assert a retaliation claim. Further, Ms. Crawley could not have suffered retaliation as a result of her filing her May 20, 2002, OCRC charge, because by that time, she had not reported to work for approximately six months. Consequently, Defendant ODOT is entitled to summary

---

[8]The Sixth Circuit has ruled "that the facts alleged in the EEOC charge, rather than merely the boxes that are marked on the charge are the major determinants of the scope of the charge." *Bray v. Palm Beach Co.*, 907 F.2d 150, 1990 WL 926722, *2 (6th Cir. 1990).

judgment in its favor with respect to Plaintiff's retaliation claim.

## C.    Hostile Environment

Ms. Crawley alleges in her amended complaint that she was subject to a racially hostile work environment. (Compl. at ¶ 3).  This Court finds that Defendant ODOT is entitled to summary judgment in its favor with respect to Plaintiff's hostile environment claim for the following reasons: (1) Ms. Crawley failed to exhaust her administrative remedies; (2) Ms. Crawley's hostile work environment claim is untimely; and (3) Ms. Crawley's hostile work environment claim fails on its merits.

### 1.    Failure to exhaust administrative remedies

As set forth by the Court in Section III.B, *supra*, Ms. Crawley is required to administratively exhaust her hostile environment claim before bringing it in federal court.  This Court, applying the same analysis it did to determine that Ms. Crawley had administratively exhausted her retaliation claim in Section III.B, *supra*, comes to the opposite conclusion with respect to her hostile environment claim.

Ms. Crawley's OCRC Charge of Discrimination stated that the discrimination began on October 19, 2001, and ended on November 1, 2001.  No continuing action box was checked.  The body of the charge stated:

> I am a Black female.  I currently hold the position of Highway Worker I.  For the past three years I have been denied overtime.  On or about October 19, 2001, Ed Flinn [sic] threatened me, stating that I would become a truck driver, and the first scratch I got on the truck I would be gone.  On or about November 1, 2001, management eliminated my position of Dispatcher.

I believe I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Crawley Depo. 18-19; Ex. 4).   Thus, the charge referenced three discrete instances of discrimination: (1) denial of overtime for three years; (2) threat of termination; and (3) elimination of position of dispatcher.  A hostile environment claim cannot reasonably be expected to grow out of these three discrete alleged acts of discrimination, otherwise, a hostile environment claim would lurk behind almost any EEOC charge of discrimination. *See e.g.*, *Nasser v. City of Columbus,* 92 Fed. Appx. 261, 263 (6th Cir. 2004) (failure to transfer and improper termination claims did not exhaust hostile work environment theory); *Park v. Howard Univ.*, 71 F.3d 904 (D.C. Cir. 1995), *cert denied*, 519 U.S. 811 (1996) (failure to promote claim did not exhaust hostile environment theory); *Hejinka v. Maryland Div. Of Corrections*, 264 F.Supp.2d 341, 346 (D.Md. 2003).  While no magic words are required, some language suggesting continuing and abusive conduct is necessary.  *See, e.g.*, *Anjelino v. New York Times Co.*, 200 F.3d 73, 93 (3d. Cir. 1999) (allegation, *inter alia*, of "abusive atmosphere" sufficient); *Little v. NBC*, 210 F.Supp.2d 330 (S.D. N.Y. 2002) (allegation, *inter alia*, of "repeated . . . humiliation and power acts" sufficient).

Plaintiff, referencing her own Depo.sition testimony, claims that she told Ms. Sintic, the EEOC officer, about other instances of discrimination, including such incidents of racial harassment as the hanging of the noose and that the EEOC officer was deficient in writing up the charge.  (Pl's Memo. in Opp. at 23).[9]  As Defendant ODOT points out, however, Ms. Crawley then corrected and

---

[9]Plaintiff, because of her allegation of agency negligence, seeks to have the court rely on her pre-complaint questionnaire as evidence that her hostile environment claim was properly exhausted. In her pre-complaint questionnaire, Ms. Crawley essentially asserts the same allegations that are contained in the body of the OCRC charge, but with respect to the overtime denial charge she alleges that ODOT had "tried to coerce me into signing off on all EEO complaints I have for the past 17 years to settle the [overtime] grievance," and that ODOT had attempted "to get me to drop all charges I have with EEO for the pas[t] 17 years then they said it

clarified this testimony stating that the aforementioned discussions were actually with Lori Goddard, an employee of ODOT who handles some internal EEO matters. (Crawley Depo. at 21-22). Ms. Crawley then maintained that she or Mr. McGowan mentioned the noose incident and other related incidents to Ms. Sintic, but this was around the time she and Ms. Sintic were discussing the results of the EEOC's investigation, and after Ms. Sintic had issued her findings that no discrimination had occurred. (Crawley Depo. at 24-26; Ex. 6). Items brought up *after* the EEOC investigator has concluded the investigation, cannot be said to be those which the EEOC would reasonably be expected to include in its investigation.

Based upon the foregoing, the Court concludes that Defendant ODOT is entitled to summary judgment in its favor with respect to Ms. Crawley's hostile environment claim because she failed to exhaust her administrative remedies for this claim. The Court continues its analysis of Ms. Crawley's hostile environment claim as alternative basis for its grant of summary judgment in Defendant ODOT's favor.

### 2.     Timeliness

This Court, as an additional basis for holding that Defendant ODOT is entitled to summary judgment on Ms. Crawley's hostile environment claims, finds that the alleged hostile environment claims are time-barred.

Ms. Crawley is required by § 2000e-5(e)(1) to file her charges of unlawful practices with the EEOC within 300 days or she will lose her ability to recover for it. For purposes of determining

---

was a mistake." The focus of this particular allegation is not on what happened to Ms. Crawley over the past 17 years, but rather on the alleged unfairness of the release offered to settle one of Ms. Crawley's overtime grievances. Thus, this Court finds that, even if the statements in the pre-complaint questionnaire were considered as part of her charge, it would not alert the EEOC to investigate a hostile environment claim, but rather to investigate the much more recent issue of her overtime grievances – a matter raised in the charge itself.

45

whether a Title VII plaintiff has complied with statutory time limitations, the U.S. Supreme Court, in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), has drawn a distinction between discrete discriminatory acts and a series of separate acts that collectively constitute a hostile work environment. After analyzing the nature of hostile work environment claims, the *Morgan* Court concluded that "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside of the statutory time period. ***Provided that an act contributing to the claim occurs within the filing period***, the entire period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.* at 117 (emphasis added).

Thus, based upon *Morgan*, this Court, in assessing the merits of Ms. Crawley's alleged hostile environment claim, will consider *all* of the alleged incidents of harassment, including those that occurred outside of the statutory filing period (including even the earliest alleged harassment of Ms. Crawley in 1985), ***provided that an act contributing to the hostile work environment claim occurs within the filing period***. The required "act contributing to the claim" need not be actionable on its own. *Id.* at 115, *citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Thus, in order for Ms. Crawley's hostile work environment claim to be timely, Ms. Crawley must have filed her charge within 300 days of any act (whether independently actionable or not) that is part of the alleged hostile work environment.

Ms. Crawley's hostile environment fails as untimely because there has not been an act contributing to her alleged hostile work environment within the filing period. Ms. Crawley's only allegations of acts contributing to the alleged hostile work environment that fall within filing period are the alleged threats by Mr. Flynn and the elimination of her dispatcher position resulting in her

re-assignment.[10]  As set forth in Section III.B, *supra*, the Court has determined that these alleged actions were not motivated by race.  Consequently, they cannot be considered as part of any alleged hostile work environment claim.

Accordingly, Defendant ODOT is entitled to summary judgment on Ms. Crawley's hostile environment claims because these claims are untimely.

### 3.     Merit

**Defendant ODOT argues that Plaintiff cannot demonstrate an actionable hostile work environment.**   A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).  Both an objective and a subjective test must be applied: the conduct must have been severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as having been abusive. *Id.* at 21-22.  Isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment.  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir.2000).  Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment include:

1.     the frequency of the discriminatory conduct;

---

[10]Ms. Crawley filed her OCRC/EEOC charge on May 20, 2002.  The most recent alleged overtime denial was on or about December 3, 2000.  (Crawley Depo. Ex. 3 at 12, 15).  This is outside the 300 day limitation in 42 U.S.C. § 2000-e5(e)(1) for deferral states such as Ohio.

    2.      the severity of the discriminatory conduct;

    3.      whether the discriminatory conduct is physically threatening or humiliating, or a mere offensive utterance;

    4.      whether the discriminatory conduct interferes with an employee's work performance; and

    5.      whether the plaintiff actually found the environment abusive.

*Id.* at 21-22; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir.2000) (reciting factors from *Harris*).  The Supreme Court has explained:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." *Id.*, at 80.  Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . ." B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992) (hereinafter Lindeman & Kadue) (footnotes omitted). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view. *See, e.g., Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-578 (C.A.2 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-750 (C.A.8 1986); *See also* 1 Lindemann & Grossman 805-807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

        The Court has reviewed the evidence Plaintiff has submitted, and concludes that even when the evidence is viewed in the light most favorable to Plaintiff, Plaintiff has fallen far short of demonstrating that she was subjected to a hostile work environment.  For this additional reason, Defendant ODOT is entitled to summary judgment in its favor on Plaintiff's hostile work environment claim.

**V.  CONCLUSION**

Based on the foregoing, the Court **GRANTS** Defendant ODOT's summary judgment motion (Doc. 15). Plaintiff's Federal Title VII claim of race discrimination is hereby dismissed with prejudice.

The Clerk shall remove this case from the Court's pending cases list.

The Clerk shall remove Document 15 from the Court's pending motions list.

**IT IS SO ORDERED.**

   **s/ George C. Smith**            
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**